IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

DONALD S. HAVERLAND,

          Plaintiff,

vs.

HOSPITAL SHARED SERVICES, INC.

**VERIFIED COMPLAINT and DEMAND FOR TRIAL BY JURY**

PLAINTIFF, Donald Haverland ("Mr. Haverland"), alleges as and for his Verified Complaint, as follows:

**PARTIES AND JURISDICTION**

1. Jurisdiction and venue in this Court are proper pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e, *et seq.*

2. Mr. Haverland is a 55 year old male resident of Colorado.

3. Defendant Hospital Shared Services, Inc. is a Colorado corporation with principal offices located in Denver, Colorado.

4. At the time of his termination, on March 15, 2013, Mr. Haverland was 54 years old.

5. Mr. Haverland was terminated by Joel Womack ("Womack") on March 15, 2013. At the time of termination, Mr. Womack was acting within the scope of his employment with HSS.

1

6. Mr. Haverland filed a Charge of Discrimination with the Equal Opportunity Commission ("EEOC") on August 9, 2013, a copy of which is attached as Exhibit "1."

7. On May 2, 2014, EEOC issued a Notice of Right to Sue on the merits of Mr. Haverland's Charge of Discrimination, which was received by his counsel on August 5, 2014. A copy of the Notice of Right to Sue letter is attached as Exhibit "2."

8. On July 23, 2014, Mr. Haverland received a *Notice of Revocation of Right to Sue*, a copy of which is attached as Exhibit "3." Mr. Haverland believes this revocation to be in error or otherwise of no effect on this court's jurisdiction. Specifically, Mr. Haverland is unaware of any notice of right to sue other than that issued by EEOC on May 2, 2014. Attached, collectively, as Exhibit "4," is Mr. Haverland's correspondence with EEOC related to this issue. The matter is alleged in the interest of candor to the tribunal.

## GENERAL ALLEGATIONS

9. Mr. Haverland was hired as a security officer by HSS on or about February 1, 2012. Prior to that date, he had been working for BRT Protective Services ("BRT"), which upon information and belief had a contractor relationship with HSS pursuant to which he was assigned to job sites by BRT and then assigned by HSS to Denver Human Services ("DHS"), located at 1200 Federal Blvd., Denver, CO.

10. Mr. Haverland was hired as a security officer and worked continuously for HSS from February 8, 2012 until termination on March 15, 2013.

11. Shortly after beginning work for HSS at DHS, Mr. Haverland was introduced to Sareth Bunta ("Ms. Bunta"), then a 23 year old woman. Almost immediately, Ms. Bunta boasted that she could get anyone fired and that she could tell her direct report, Christine Spader ("Ms.

Spader"), and beyond Ms. Spader, upper level management, anything and further, that she would be believed.

12. An important component of Mr. Haverland's job duties included completion of Daily Activity Reports ("DAR"). Shortly after beginning work at DHS, Ms. Bunta gave Mr. Haverland a copy with times already entered and told him to submit the same reports every day he worked. Mr. Haverland discussed this issue with Ms. Spader and he was instructed not to use pre filled in forms. Following this exchange, Ms. Bunta threatened to "teach Haverland a lesson."

13. Between February 29, 2012 and June 15, 2012, Mr. Haverland received various accolades from HSS, including congratulatory emails and promises of cash awards. These promises proved elusive.

14. On or about June 15, 2012, Ms. Bunta asked Mr. Haverland to stand with her husband-to-be at her wedding. Mr. Haverland declined. On the same date, Mr. Haverland received an award from HSS for providing excellent customer service. The award was given to him by Ms. Spader.

15. On or about August 15, 2012, Ms. Bunta asked Mr. Haverland to join her husband's motorcycle club. On the same day, Mr. Haverland received an award from HSS for providing world class customer service. The award was given to him by Ms. Spader.

16. On or about August 19, 2012, Ms. Bunta made a remark about Mr. Haverland's old age. Ms. Bunta told Mr. Haverland of a position available downtown, that he should apply for it and that he would "last longer" if he did. Ms. Bunta reiterated that Mr. Haverland's age was the reason he should consider applying for a transfer.

17. On or about September 12, 2012, Ms. Bunta asked Mr. Haverland to work on her husband's motorcycle. Mr. Haverland declined and Ms. Bunta became abusive.

18. Following Mr. Haverland's refusal to participate in Ms. Bunta's wedding, or to join her husband's motorcycle gang or to help fix her husband's motorcycle, Ms. Bunta's began treating Mr. Haverland differently and putting Mr. Haverland down.

19. On or about October 17, 2012, Haverland received an award from HSS.

20. On or about November 1, 2012, Ms. Bunta told Mr. Haverland that he was from a different, older generation and was not able to understand how her younger generation works and thinks. She told him that he because he was old, he wasn't as smart as she was. Ms. Bunta did not confine her remarks to Mr. Haverland, but made remarks about other older co-workers as well.

21. To this point, the foregoing derogatory and threatening remarks and conduct continued. Mr. Haverland did not report the incidents to Ms. Spader because he feared for his safety and his job.

22. On or about December 1, 2012, Ms. Bunta asked Mr. Haverland why he was not retired and on Social Security and commented that he should not be working but on disability on account of his age.

23. Between January 12, 2013 and January 14, 2013, Mr. Haverland received commendations and a promise of an award for excellent work and customer service from Ms. Spader and her superiors. On January 15, 2013, he was promised a cash award from Monica McRae for "world class customer service."

24. On January 15, 2013, Mr. Haverland was told by Ms. Spader that she was moving him from the second floor of the work place to the first floor. Mr. Haverland requested that such a reassignment not be made, for at least two reasons: one, it would be easier for him physically to continue working on the second floor and two, Ms. Bunta was abusive and insulting and he feared for his safety and his job if he was required to work with Ms. Bunta on a daily basis.

25. Prior to his arrival at the DHS work place, Ms. Spader had been made aware of an injury Haverland had sustained 11 years prior to the events which underlie this law suit. The injury had resulted in a permanent disability to his left foot which left him in some pain and with a pronounced limp. Mr. Haverland had previously informed Ms. Spader and others at HSS and DHS of the injury and that he was able to perform his security officer duties with reasonable accommodation. Working on the second floor of the DHS building was precisely that sort of accommodation, because it allowed him to sit sometime, stand sometime, walk around a bit and lean on the counter when he had to. In fact, as demonstrated in the preceding allegations, Mr. Haverland was performing his duties to the clear satisfaction of his superiors at HSS.

26. Ms. Spader reassigned Mr. Haverland to the first floor, despite his injury and despite his stated complaints regarding Ms. Bunta's abusive behavior and derogatory comments concerning his age and disability. In fact, immediately upon his arrival to the first floor, Ms. Bunta's attitude became more belligerent and abusive than it ever had been.

27. Examples of Ms. Bunta's increasing belligerence and abusive behavior after January 15, 2013 include but are not limited to comments regarding older workers and her desire to see younger people working at DHS.

28. On or about January 31, 2013, Mr. Haverland was told that Ms. Bunta was making derogatory remarks about Mr. Haverland's age and disability. Mr. Haverland was cautioned to accept nothing edible from Ms. Bunta unless it was sealed.

29. Between January 31, 2013 and February 7, 2013, Mr. Haverland received further congratulations from his superiors for work well done.

30. On February 14, 2013, Mr. Haverland decided to bring his issues concerning Ms. Bunta to the attention of Ms. Spader. A meeting was held with Ms. Spader and Ms. Bunta present. Ms. Bunta stated that she had been covering for Mr. Haverland since he began working at DHS and that neither Ms. Spader nor Mr. Haverland was aware of this fact. Ms. Bunta stated in front of Ms. Spader that she, Ms. Bunta, carries grudges and like to get even with people, that Mr. Haverland was not her father and that she was not going to treat Mr. Haverland any differently than she had treated other older workers she did not like. Ms. Bunta then left the room.

31. Ms. Spader did nothing and instead told Mr. Haverland to get back to work and to stay calm. The issues raised by Mr. Haverland in the February 14, 2013 meeting went unaddressed.

32. On or about February 21, 2013, Mr. Haverland again spoke to Ms. Spader regarding Ms. Bunta's blatant abusive and derogatory conduct. He again asked to be moved back to the second floor both to accommodate his injured foot and to achieve separation from Ms. Bunta.

33. Beginning on or about February 28, 2013, Mr. Haverland's situation with Ms. Bunta became increasingly more abusive. By way of example and not limitation, Ms. Bunta

would tell Mr. Haverland to check something on a different floor and that she would finish a particular task on Mr. Haverland's behalf. On February 28, the task was the filling in of name badges. Ms. Bunta did not perform the task and Mr. Haverland was reprimanded by Ms. Spader. Mr. Haverland explained the situation and Ms. Spader told Mr. Haverland that Ms. Bunta had made no such offer.

34. At this point, Mr. Haverland noticed that his work notes were turning up missing. Mr. Haverland was quite sure that Ms. Bunta was responsible, but he refrained from speaking up. Ms. Spader was siding with Ms. Bunta and Ms. Bunta herself was abusive and threatening. Mr. Haverland feared for his job and his safety.

35. On February 28, 2013, Mr. Haverland received a promise of cash award from HSS and the DHS Oscar for World Class Customer Service.

36. On March 1, 2013, Robert Lackey reviewed Haverland's DAR for that day. He commented that it was "perfect" and "just what he wanted to see." Upon information and belief, Ms. Bunta was aware of the exchange regarding the DAR.

37. The next day, Mr. Haverland received a counseling report regarding the way Mr. Haverland was filling in the DAR's. Mr. Haverland was confused because he had just been told that his DAR's were perfect.

38. On or about March 5, 2013 Ms. Bunta stated to some of her co-workers that Mr. Haverland was stupid and old and walked with a limp. In earshot of Mr. Haverland, she stated that Mr. Haverland "was too old for the job" and that she was "going to get rid of" Mr. Haverland and have Mr. Haverland replaced with someone younger.

39. On or about March 7, 2013, Ms. Bunta told Mr. Haverland that they all would have to start taking breaks and lunches when they were supposed to and not as they had been doing. Mr. Haverland immediately agreed that this was appropriate.

40. On or about March 7, 2013 Mr. Haverland left a bottle of soda pop at his work station. When he returned and took a sip from it, he started to choke. He did not finish the soda, but rather threw the bottle away on his way out the door that evening.

41. On March 15, 2013, Mr. Haverland met with Ms. Spader and Mr. Womack who informed Mr. Haverland that he had been caught on camera spitting into Ms. Bunta's bottle of soda pop. Mr. Haverland proceeded to recount to both Ms. Spader and Mr. Womack the nature of Ms. Bunta's attitude and the history of her abusive and derogatory conduct. Neither Ms. Spader nor Mr. Womack listened to Mr. Haverland's explanation of the soda pop matter. Mr. Haverland asked to see the security camera tape. The request was refused and Haverland was terminated that day.

42. On March 21, 2013, Mr. Haverland received a reward from Barbara Mary of HSS in appreciation for Mr. Haverland's support and contributions to the success of HSS.

43. HSS treated Mr. Haverland, who as in his 50's and disabled, differently than younger workers and differently than those who required some degree of physical accommodation. By way of example and not limitation:

    a. Sareth Bunta, Asian, age 23, cast frequent aspersions on older people, yet upper management not only tolerated the behavior but expressed that Ms. Bunta, at least in Ms. Spader's eyes, could do no wrong;

b. Douglas Quiggle, white, age mid 40's, required hip surgery and was permitted time off. When he recovered he was returned to his previous duties;

c. Alan Ferguson, white, age mid 40's, reported problems with Bunta and was reassigned from DHS to the Family Crisis Center;

d. Richard Schmaltz, white, late 50's, reported problems with Ms. Bunta and was reassigned from DHS to the Permit Center;

e. Robert Lackey, white, mid-20's, discussed the concept of a union for security guards. Mr. Haverland was warned that any such participation would result in immediate termination from HSS. Following Ms. Bunta's antagonism, Mr. Lackey also became abusive. Mr. Haverland reported the antagonism to Ms. Spader who informed Mr. Haverland that these "were battles he could not win;"

f. Armand Ashby, black, early 20's, got along well with Mr. Haverland until Ms. Bunta became abusive and which point Mr. Ashby did also. Haverland reported the matter to Ms. Spader who did nothing;

g. Darius Wright, black, early 20's, got along well with Mr. Haverland until Ms. Bunta became abusive at which point Mr. Wright did also. Mr. Haverland reported the matter to Ms. Spader, who did nothing;

h. Brigette Baramah, black, early 20's, was disrespectful from time she started working at DHS, and Mr. Haverland frequently had to perform her duties as well as his own. Mr. Haverland reported the matter to Ms. Spader who did nothing. Mr. Haverland reported the matter to Ms. Spader's' supervisor at which point Ms. Baramah's conduct gradually improved;

      i. Joel Womack, white, mid 40's, HSS upper management above Ms. Spader, the person who actually fired Mr. Haverland. Mr. Womack told Mr. Haverland he had already made up his mind to terminate Mr. Haverland based upon the video evidence, although Mr. Womack refused to allow Mr. Haverland to review the evidence;

44. On March 15, 2013 Mr. Haverland was terminated

45. Mr. Haverland's termination was part of a pattern of discriminatory conduct, based upon Mr. Haverland's age and physical disabilities.

46. Mr. Haverland was terminated on a pretext in violation of Title VII of the United States Code, the Age Discrimination in Employment Act, and various rules and regulations promulgated thereunder.

### FIRST CLAIM FOR RELIEF
(Discrimination Based on Disability)

47. Mr. Haverland incorporates the foregoing allegations as though fully set forth herein.

48. Mr. Haverland had a physical impairment that substantially limited one or more of his major life activities.

49. Mr. Haverland was believed by his employer to have a physical impairment.

50. Mr. Haverland was otherwise qualified to perform the duties assigned to him by HSS.

51. HSS failed to make reasonable accommodations to the known limitations of Mr. Haverland, by among other things, reassigning him to duties on a different floor which made it more difficult for Mr. Haverland to perform duties he was otherwise qualified to perform.

52. HSS treated other employees with disabilities differently and more favorably than Mr. Haverland.

53. Mr. Haverland's disability was a motivating factor in HSS's decision to terminate him from his employment.

54. Prior to his termination Mr. Haverland had a good employment record.

55. The reasons stated by HSS for termination were pretextual.

56. As a proximate result of HSS's discrimination in violation of statute, Mr. Haverland has been damaged in amount to be determined at trial.

57. Mr. Haverland is entitled to an award of attorney fees and costs.

WHEREFORE, Mr. Haverland requests the relief more fully set forth below.

## SECOND CLAIM FOR RELIEF
(Discrimination Based on Age)

58. Mr. Haverland incorporates the foregoing allegations as though fully set forth.

59. At all times material hereto, Mr. Haverland was a member of a protected class in that he was older than 40 years of age.

60. Mr. Haverland was at all times material hereto qualified for the position he held with HSS.

61. Mr. Haverland was terminated from his employment at least in part due to his age.

62. Prior to his termination, Mr. Haverland had a good employment record.

63. The stated reasons for termination were pretextual.

64. As a proximate result of HSS's discrimination based on age, Mr. Haverland has been damaged in an amount to be proven at trial.

65. HSS's actions were willful in that it knew or showed reckless disregard for whether its conduct was prohibited by the Age Discrimination in Employment Act.

WHEREFORE, Mr. Haverland request the relief more fully set forth below.

### THIRD CLAIM FOR RELIEF
(Wrongful Termination)

66. Mr. Haverland incorporates paragraphs 1 through 64, inclusive, of this Verified Complaint as though fully set forth herein.

67. Upon information and belief, Mr. Haverland was terminated, in part, in violation of policies and provisions set forth in the HSS Employee Handbook.

68. Mr. Haverland's termination was wrongful.

69. As a proximate result of Defendant, Hospital Shared Services, Inc.'s wrongful termination of his employment, Mr. Haverland is entitled to an award of damages, in an amount to be determined at trial.

**WHEREFORE**, Plaintiff, Donald s. Haverland, demands judgment be entered in his favor and against Defendant, Hospital Shared Services, Inc., as follows:

    a. Actual, consequential and incidental damages in an amount to be proven at trial;

    b. Costs, expenses, attorney fees and expert witness fees;

    c. Interest as provided by law; and

    d. Such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by a jury on all issues so triable.

DATED this ___ day of July, 2014.

                                      Respectfully submitted,
                                      David H. Wollins, P.C.

By: *s/David H. Wollins*
David H. Wollins, #15848
950 South Cherry Street, Suite 512
Denver, Colorado 80246-2664
(303) 758-8900
ATTORNEYS FOR PLAINTIFF

Plaintiff's address:
15627 East Atlantic Place
Aurora, Colorado 80013

13

## VERIFICATION

STATE OF COLORADO      )
                       ) ss.
COUNTY OF DENVER       )

I, Donald S. Haverland, hereby verify that the facts set forth in the foregoing **VERIFIED COMPLAINT AND DEMAND FOR TRIAL BY JURY** are true and correct to the best of my knowledge, information and belief.

*/s/ Donald Haverland*
Donald S. Haverland

SUBSCRIBED AND SWORN TO before me by this 25th day of July 2014.

[Notary stamp: RONALD R. COVEY, NOTARY PUBLIC, STATE OF COLORADO, NOTARY ID 20024020836, MY COMMISSION EXPIRES JUNE 27, 2018]

Notary Public */s/ Ronald R. Covey*

My commission expires: 6/27/2018